COTE & VAN DYKE, LLP
ATTORNEYS & COUNSELORS AT LAW
214 NORTH STATE STREET
SYRACUSE, NEW YORK 13203
(315) 478-3074

July 24, 2018

Honorable Andrew T. Baxter
United States Magistrate Judge
United States District Court
Northern District of New York
James M. Hanley Federal Building
P.O. Box 7367, 100 S. Clinton St.
Syracuse, New York 13261-7367

    Re:    David Impellizzeri
                Case No. 5:17-cv-230 (FJS/ATB)

Dear Justice Baxter:

# Discovery Issues

Pursuant to the text order of July 3, 2018, the following is a status report of unresolved discovery issues. The short answer is that the defendants have failed to make a good faith effort to respond to plaintiff's various discovery demands. In an effort to resolve the discovery issues with the State defendants, I repeatedly made calls to both of the attorneys assigned to represent the State defendants. After making several calls attempting to reach counsel, I forwarded email correspondence to opposing counsel. The following is a more detailed statement of the unresolved matters.

## Policies and Procedures

    (A) On June 14, 2018, the plaintiff demanded the "Policies and Procedures Manual entries regarding the use, purpose, and function of the Labor Relations Action Form." On July 18, 2018, in response to this request, opposing counsel wrote, "*I am still waiting on some documents from Upstate with respect to your Third and Fourth discovery demands. **It is very difficult to get responses** to demands from them but I have tried to send several reminders.*"

It is also difficult to understand why it has taken so long to produce these documents. Upon information and belief, these records are readily available for inspection on the Upstate intranet to every Upstate employee. On June 20, 2018, I wrote to Ms. Cowen suggesting the discovery disputes concerning Policies and Procedures could be resolved by granting a temporary access to

the policies and procedures manual of the Upstate website[1]. With such access Plaintiff's counsel could identify the relevant policies and procedures and they could then be produced. On July 5, 2018, Ms. Cowen stated: "... *with respect to your question about a table of contents for Upstate's policies—I am told by Upstate counsel that there are a significant amount of regulations that they have that apply to different departments and employees across campus and in the hospital, since they are a state employer and public hospital. They literally have policies that govern window blinds and there is no overall table of contents for every Upstate policy/procedure* ... **If you could let me know specifically what departments or topics you are looking for with respect to Upstate policy, that would be a big help and I could forward it on to Upstate counsel.**"

This request that we identify the applicable polices before they are produced places the plaintiff in the impossible position of having to name a policy without access to the list of policies that exist. Additionally, we have been as specific in our demands as is possible without access to an index. On June 20, 2018, I requested "the *policies and procedures to be followed by Thompson, Feeney and the other named defendants.*" I can only assume there are regulations governing the various duties and actions they carried out during the disciplinary process and when supervising Impellizzeri and Campagni. I cannot specifically name those policies but given the fact that the hospital has promulgated 'window blind' policies it is impossible to believe otherwise.

Any claim that temporary access to the Upstate intranet would undermine the security of the hospital is false. These documents are already accessible by thousands of employees. We are talking about allowing counsel an opportunity to review the policies and procedures already available to thousands of employees, not the nuclear codes.

*Why this matters.* In her response to question two of our Interrogatory demands, defendant Brackett has stated the sole purpose of the Labor Relations Action Form was to refer the matter to the Labor Relations Department. Is that true? We do not know because we have not reviewed the "Policies and Procedures Manual entries regarding the use, purpose, and function of the Labor Relations Action Form."

But what we do know is that codefendant Barber, who is not a member of the Employee/Labor Relations Department, obtained statements from Campagni and from the other key witnesses. It is our understanding that due to the seriousness of the matter, the investigation was to be conducted by the Employee/Labor Relations Department and the Office of Diversity and Inclusion. It should not have been conducted by Barber who was a supervisor of both Impellizzeri and Campagni. We have reason to believe that Barber violated hospital policies in

---

[1] On June 20,2018, I wrote: "I am concerned that I do not have possession of the policies and procedures governing the defendants' conduct in the performance of a proper investigation. Although I have received some documentation regarding the policies the hospital claimed were violated by Impellizzeri, I have not received the policies and procedures to be followed by Thompson, Feeney and the other named defendants. I could devote several hours into assembling all of the various demands that have been made in both the State and Federal actions regarding these demands but think **the better course would be to request that the State provide me access to the "intranet" policies and procedures manual** so that I can identify the policies governing the proper investigation of alleged employee misconduct. This would relieve you of the burden of identifying the applicable policies and would provide me with some assurance that I have obtained the appropriate documents."

the manner she took these statements. Unfortunately, we do not have access to those polices as they existed in 2015.

> (B) On April 12, 2018, Plaintiff demanded production by the State of the exhibits (including **Policies and Procedures**) cited by Maxine Thompson, Office of Diversity and Inclusion, during her testimony at the Arbitration hearing on December 21, 2015.
> - E15: Procedure for investigating allegations of discrimination (AT pages 149-150). Thompson stated, "This is our Internal Complaint Procedure."
> - E16: Internet policy on Sexual Harassment (AT pages 150-152). Thompson stated, "This is information that is publicized on the Internet, on the website, that is what we used to help educate the campus around sexual harassment."
> - Staff Ed TV (AT page 150): a digital copy of the trainings regarding sexual harassment on Staff ED TV as they existed in June 2015.

On June 20, 2015, after receiving no response for months, I wrote to the Attorney for the State advising that, *"I am concerned that I do not have possession of the policies and procedures governing the defendants' conduct in the performance of a proper investigation."*

*Why this matters.* The plaintiff has obtained a copy of *the Complaint Procedure for Review of Allegations of Unlawful Discrimination*, promulgated by the Office of Diversity and Inclusion, and revised in May 2016. We have repeatedly requested but not obtained the version of this policy as it existed in 2015. In providing answers to plaintiff's interrogatories, defendant Thompson complained repeatedly that the plaintiff failed to cite the policies upon which the questions were based. Additionally, in answering question 2(b) Thompson stated that "there was no policy in place during the relevant time period" that required she provide Impellizzeri with a copy of her adverse determination against him. We do know the policy as it existed in May 2016, required the determination be provided to Impellizzeri so that he could appeal her determination.[2] Did that policy exist in 2015? We do not know because the exhibits and policies requested in April 2018, have not been produced.

> (C) On September 11, 2017, Plaintiff demanded the Policies and Procedures maintained by the hospital concerning the duties and responsibilities of codefendant Barber, as they relate to her role in disciplining employees accused of misconduct. Specifically, any documents that instruct *"Barber and others"* as to *"the proper and approved of methods of investigating claims of employee misconduct so as to protect the due process rights of the accused employees."* (request KK)

This demand should have been inclusive enough, and specific enough, to have resulted in the production of all hospital policies and procedures relevant to the role of Barber and others who participated in the disciplinary procedures that took place. In her response of January 11, 2018,

---

[2] The Complaint Procedure for Review of Allegations of Unlawful Discrimination, Section V(G) states: *"Upon completion of the investigation, the SUNY Upstate Chief Diversity Officer (Thompson) shall send a letter to the Complainant and Respondent acknowledging the completion of the investigation and the outcome."* The determination was made on July 29, 2015, and a letter was sent to Campagni on October 8, 2015. The plaintiff was given no information that such a determination had been made until January 2018 as part of discovery in this action. Section V(H) stated the respondent had 10 days to have that determination reviewed by the Senior Vice President of Operation ("Appeal") in this case no appeal was filed because plaintiff was never informed a decision had been rendered.

State counsel referred us to Barber's job description rather than provide the applicable policies and procedures. A proper response to this demand should have produced all of the policies and procedures relative to discipline from the Nursing, Employee/Labor Relations and Diversity and Inclusion departments.

Email Demands

On May 25, 2018, in a third set of Federal demands, Plaintiff demanded copies of all writings, notes, and/or correspondence to or from State employees, Valerie Ayers, Lisa Tesorio, and/or Nancy Page regarding the Plaintiff and/or Cindy Campagni. On June 18, 2018, State counsel acknowledged receipt of the demands indicating she was "going on vacation next week and I have 2 trials in July."

I responded on June 20, 2018, reminding counsel that "The court has asked that we comply with a scheduled and I don't see how we can do that unless the work is done" and that perhaps "we will have to turn to the court to explain the difficulties and get some input as to whatever adjustments need to be made to both keep the case moving forward…" I am still awaiting these documents.

## Interrogatory Responses

Since the time of our last conference, the State has provided interrogatory responses for defendants; Brackett, Feeney, Thompson, and the State of New York.

**Brackett** was asked nine (9) interrogatory questions with subparts. Despite pages of objections to such questions, Brackett provided an adequate response to most of those questions. However, Brackett sidestepped or refused to answer three (3) of the questions posed.

- Question (2) asked whether Brackett confirmed the accuracy of statements contained in a Labor Relations Action Form before placing her signature on the document. She did not answer the question with a yes or no. Rather she stated *"confirming the date, time place and circumstances of the allegations in the Labor Relations Action Form is beyond the scope of my duties. The purpose of this form is simply to initiate an investigation by Employee Labor Relations into an employee's allegations."* Although the answer provided by Brackett suggests she did not confirm the accuracy of the information, she avoided directly answering the question.
- Question (8c) asked if it were normal and customary to reassign an employee who had been out of work for nearly a year, to a floor and shift that he had never been permanently assigned to before, without orientation to the job.[3] In response Brackett stated: *"Defendant objects to this question as a mischaracterization of the facts of this case."* Brackett did not answer the question.

---

[3] This was an important question as the Plaintiff was concerned that his assignment to Nursing Unit 4North, a floor where he was not regularly assigned prior to being placed on leave, was a set up. Without receiving orientation to that new job, patients would be placed at risk by the assignment of a nurse unfamiliar with the customs and practices employed in the care for that patient population. It also needlessly exposed Impellizzeri to the risk of errors due to his lack of familiarly with the current policies and procedures on that floor and that such errors would be used to further discipline the plaintiff.

- Question (9) asked *"Whose idea was it to threaten the Plaintiff with termination before he even returned to work."* In reply Brackett stated she had seen letters like this in the past and the letter used 'standard language.' This is an answer to a question not asked. Who decided to use that alleged 'standard language', was it Brackett, Feeney, or someone else? The question was unanswered.

In addition, the defendant repeatedly stated the questions are better for a deposition and sidesteps the question. Are the long objections followed by short nonresponsive answers a foreshadowing of the depositions? If so, I foresee the need to appoint a special master to supervise depositions.

**Feeney** was asked nine (9) interrogatory questions with subparts. Despite pages of objections to such questions, Feeney provided an adequate response to most of those questions. However, Feeney sidestepped or refused to answer five (5) of the questions posed.

- Question (1a) asked what steps she had taken before rendering her 'professional opinion' to fail the plaintiff on his probation on June 29, 2015. In an attempt to sidestep answering the question, she stated she did *"not have the authority to make the determination that any employee fails or passes their probation ..."*
- Question (1b) asked what facts she established as true before rendering her professional opinion that the plaintiff should be failed on probation. She refused to answer the question stating only that the question was more appropriate for a deposition.
- Question (2a) asked whether she agreed with the suggestion by codefendant Klaiber to "do our best to not have him return" to work. She objected saying it called for the state of mind of Klaiber when if fact it called for the state of mind of Feeney. Did she or did she not agree with the decision that they would do their best to keep him from returning to work? She only had to agree or disagree.
- Question (4a) asked who decided to conduct the interrogation of Impellizzeri at the police station. Feeney proceeded to provide justifications as to why the interrogation was held at the police station but refused to say who made the decision.
- Question (5) asked Feeney the basis of her belief that Campagni would 'not make all that stuff up.' The question refers to the disciplinary interrogation of Impellizzeri on August 12, 2015 where Feeney asked Impellizzeri "do you know why someone would make all of that up against you?" (See interrogation transcript page 8.) Feeney sidestepped the question stating she was "not entirely clear whether the quote is intended to be attributed to her."

**Thompson** was asked eight (8) interrogatory questions with subparts. Despite pages of objections to such questions, Thompson provided an adequate response to most of those questions. However, Thompson sidestepped or refused to answer five (5) of the questions posed.

- Question (1a) asked about the email written by Lori Feeney in which she offered her "professional opinion" that Impellizzeri should be failed on probation. In response to that email Thompson wrote, "Wow, I agree with Lori." The question asked Thompson what facts had been uncovered to support her agreement with the decision to fail Impellizzeri on probation. Thompson sidestepped the question pretending not to know what she

agreed with or why. The emails themselves are not capable of being misconstrued and she should be required to answer the question rather than pretend confusion.
- Question (1b) asked for a list of employment records of Campagni that she reviewed prior to making a determination on sexual harassment. Thompson responded stating whom she contacted, but provides no list of employment records that she reviewed. Implied in the answer is that she reviewed no records of Campagni, but refused to state as such. She should be required to answer the question stating either that she reviewed no records or be required to provide a list of which records she did review.
- Question (2a) asked what factual conclusions she reached regarding a list of factors she was required to consider. That list of factors was also provided: (i)Whether the complaint was inherently plausible, (ii) Whether the demeanor of the complaining witness was consistent with truth telling, (iii) Whether Campagni had a motive to falsify, (iv) Whether Campagni had evidence of corroboration, and/or (v) Whether either the Complainant or Respondent's prior histories were consistent with the complaint being true or fabricated. These factors are directly from EEOC guidelines which Thompson testified she was familiar with.[4] (AT 148-149) Thompson objected wanting to know specific citations for the policies, although she did not disagree those are the factors that must be considered. However, she refused to answer the question. This was another sidestep.
- Question (4a) asked what she said to Tesorio or others that supported the understanding that some of the things Campagni had said were not true. Answering the question does not require Thompson to ascertain the state of Tesorio's or anyone's state of mind. She utterly refused to answer the question.
- Question (7a) asked what evidence Thompson collected that Impellizzeri would **"routinely"** make unwelcomed sexually charged comments as counsel for the hospital claimed she would testify to. She sidestepped the question and provided no answer.

The final set of interrogatories was asked of the State of New York. It consisted of seven (7) interrogatory questions with subparts. After almost eight weeks, none of the questions were answered. The only response was, "With respect to Plaintiff's First Set of Interrogatories to State of New York, the format of these interrogatories is improper and cannot be responded to in their current form ..." She should be required to answer the questions.

Interrogatory Responses from Campagni

On January 31, 2018, Campagni offered limited responses to the interrogatories posed by the Plaintiff. In answering those interrogatories Campagni alleged that Impellizzeri, "was rough and condescending to a young female" patient.

Prior to this interrogatory answer Campagni had never claimed that Impellizzeri "was rough and condescending to a young female" patient. On May 9, 2018, in a phone conference with the Court, Campagni was ordered to describe this "young female" alleged to have been treated roughly and to elaborate how this new 'victim' was treated roughly.

---

[4] *Enforcement Guidance of Vicarious Employer Liability for Unlawful Harassment by Supervisors*, EEOC Notice #915.002, June 18, 1999, Credibility Determinations, Ida L. Castro, Page 11

The court stated: "limited follow-up is appropriate with respect to Ms. Campagni's new accusation about plaintiff's poor interaction with patients made in response to the First Set of Interrogatories that were propounded in the State Supreme Court action ... "The court then instructed Campagni to respond to "the second sentence of interrogatory 1a, interrogatory 1b, also specifying any prior occasions when Ms. Campagni made this particular allegation against plaintiff, interrogatory 1g, and the first sentence of interrogatory 1h." Plaintiff objects to Campagni's answer to 1h as not adequately responsive.

> 1h (first sentence): Please describe the "young female" who was the victim of this "rough and condescending treatment." Please provide a description, name, and approximate age of the alleged young female.
>
> ... The patient was between 20-30 years of age and had undergone multiple surgeries. She was unable to walk and asked that Plaintiff not be allowed to assist her in ambulating.

*Why this matters.* In her original complaint on June 29, 2015, Campagni wrote, "... *we were assigned a post-op hip replacement. The woman asked that Dave not be allowed to assist her to ambulate."* Are we to assume that this is the same patient Campagni now describes as a young woman with multiple surgeries?

The plaintiff is demanding a physical description of this patient in order to corroborate the existence of any such patient under the care of Campagni and Impellizzeri while they were working together. Given Campagni's failure to actually describe the patient, and her changing description of the patient we insist on details which may prove no such patient or patients exist.

Other Documents

On May 25, 2018, Plaintiff demanded copies of the handwritten notes taken by the participants at arbitration on December 21, 2015 and January 5, 2016 as well as documents produced from those notes. We are still awaiting these documents.

## Representation Issues

After having begun a review of the interrogatory answers of, Denise Barber (Assistant Director of Nursing Support) and Lori Feeney (Employee Labor Relations Representative), the plaintiff is concerned that the conflicting factual positions taken by each of these defendants, makes it inappropriate that the several individual defendants be represented by a single attorney's office.

On July 9, 2018, I wrote to Ms. Cowen and Mr. McArdle asking that their office undertake a review of whether their office should be representing multiple defendants who have taken conflicting factual positions.

In answers to the interrogatory questions, defendants Feeney and Barber have taken positions which reveal conflicting factual positions and interests.

By way of example; **Barber on behalf of herself and as the representative of the Nursing Department states:** *"that the final determination to terminate plaintiff Impellizzeri from probationary employment was made by SUNY Employee Labor Relations ... "* (ELR) and in other places she states; *"The decision to terminate plaintiff Impellizzeri from probationary employment was made by SUNY management with input from defendant Barber, SUNY Upstate administration and SUNY Human Resources ... "* and concludes with the argument that *"Defendant Barber provided input but did not make the final determination to terminate plaintiff Impellizzeri from probationary employment."* Barber's argument that the decision was made by Employee/Labor Relations is contradicted by Feeney.

**Feeney from her perch in the ELR states,** *"I do not have the authority to make the determination that any employee fails or passes their probation period. I deny 'rushing to judgment' or 'tramping' on Plaintiff's due process rights ... I had not formed an opinion as to whether or not he was guilty ... I have no authority to end Plaintiff's career at Upstate."* Feeney was the representative of SUNY Employee Labor Relations. Barber says the decision was made by that department.

The position taken by these two defendants are at odds with one another. As the proof develops it grows increasingly clear that it might not appropriate for these several defendants to be represented by the same office.

I have not received a response to my letter of inquiry and believe this is a subject that should be addressed in a conference with the court.

Very truly yours,

COTE & VAN DYKE, LLP

Joseph S. Cote, III

cc: Christine Sullivan Esq.,
Gale Gale & Hunt, LLC
P.O. Box 6527
Syracuse, New York 13217

Aimee Cowen, Esq.
Assistant Attorney General
New York State Office of the Attorney General
Syracuse Regional Office
615 Erie Boulevard W, Suite 102
Syracuse, New York 13204